# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re

**MAURICE B. WYMAN**,                                      Chapter 7
                                                           Case No. 14-15422-JNF

     Debtor

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**PREMIER CAPITAL, LLC**,
     Plaintiff,

v.                                                         Adv. P. No. 15-1132

**MAURICE B. WYMAN**,
     Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the two-count First Amended Complaint (the "Amended Complaint") filed on March 1, 2017 by judgment creditor Premier Capital, LLC ("Premier") against the Chapter 7 debtor, Maurice B. Wyman ("Maurice"), the brother of his business partner, Michael P. Wyman ("Michael"), who is also a Chapter 7 debtor in Case No. 14-15423-JNF (Maurice and Michael, jointly, the "Wymans"). Through the Amended Complaint, Premier seeks denial of Maurice's discharge pursuant to 11 U.S.C. § 727(a)(4) (Count I) and (a)(2) (Count II), alleging that he made false oaths and accounts in his original and amended Schedules, Statement of Financial Affairs and at his

Section 341 meeting of creditors and that he concealed and/or transferred property with the intent to hinder, delay or defraud a creditor.[1]

Premier filed a similar amended complaint against Michael containing the same counts for denial of discharge in Adv. Pro. No. 15-1131. On December 2, 2016, this Court conducted a pretrial conference in both adversary proceedings and allowed Premier's Assented to Motion to Consolidate Adversary Proceedings for Trial pursuant to Fed. R. Civ. P. 42, made applicable hereto by Fed. R. Bankr. P. 7042, as both adversary proceedings share common questions of fact and law.[2]

The Court conducted a consolidated trial over the course of four days in both adversary proceedings on March 6, 8, 20 and 21, 2017 at which six witnesses testified and 40 exhibits were introduced into evidence.  At the conclusion of the trial, Premier indicated its intention to seek leave of court to further amend its Amended Complaints to conform to the evidence produced at trial.  Eight days after the conclusion of the trial, on March 29, 2017, Premier filed Motions to Amend the Amended Complaints in both adversary proceedings to conform to the evidence adduced at trial pursuant to Fed. R. Civ. P. 15(b), made applicable hereto by Fed. R. Bankr. P. 7015, to add counts for denial

---

[1] Premier did not specify in the Amended Complaint whether Count I was based on § 727(a)(4)(A), (B), (C) and/or (D) or whether Count II was based on § 727(a)(2)(A) and/or  (B).  It clarified its position, however, in its post-trial brief that Count I is based on § 727(a)(4)(A) and Count II is based on § 727(a)(2)(A).

[2] Maurice and Michael filed their voluntary Chapter 7 petitions on the same date, and Premier commenced both adversary proceedings against them on the same date. Pleadings and orders in these adversary proceedings were filed or entered on the same date in both adversary proceedings unless otherwise specified herein.

of discharge under 11 U.S.C. § 727(a)(3) for the Wymans' alleged destruction of records concerning their business affairs.  The Wymans objected.  On April 18, 2017, the Court denied the motions, ruling that further amendment of the Amended Complaints after the close of evidence would have deprived the Wymans of the ability to call witnesses to explain the alleged destruction of records in support of a defense under § 727(a)(3) and would, therefore, cause them unfair prejudice.  The parties thereafter filed their post-trial briefs.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a) and (b) and the order of reference from the United States District Court for the District of Massachusetts.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).  The Court now makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.  For the reasons set forth below, the Court finds that Premier has sustained its burden of proving denial of Maurice's discharge pursuant to 11 U.S.C. § 727(a)(4)(A) and shall enter judgment in its favor. The Court has made the same ruling on this date in Premier's adversary proceeding against Michael, *see* Premier Capital, LLC. v. Michael P. Wyman, Adv. Pro. No. 15-1131, Slip Op. (July 20, 2017), which is hereby incorporated by reference.

## II. PROCEDURAL BACKGROUND[3]

### A.    Common Facts

The Wymans, through a complex structure of corporations, limited liability companies, and trusts, owned, operated and/or managed numerous Burger King restaurants and/or real properties beginning in the early 1970s through approximately 2015.[4]  Maurice and Michael filed contemporaneous voluntary petitions under Chapter 7 of the Bankruptcy Code on November 20, 2014, and Debora Casey was appointed the Chapter 7 Trustee (the "Trustee") in both cases.   Maurice and Michael were each represented in their respective bankruptcy cases and adversary proceedings by the same counsel, Attorney Jeffrey Johnson.  The initial § 341 meeting of creditors was jointly held in both cases on February 25, 2015 and was continued and eventually concluded on May 7, 2015.  Premier introduced into evidence at the trial the transcript of the February 25, 2015 meeting of creditors (hereinafter the "§ 341 Meeting"). On May 21, 2015, Premier filed a proof of claim in each of the Wymans' bankruptcy cases asserting a claim for $1,341,594.91 for "Judgment on a loan."   On July 1, 2015, the Internal Revenue Service (the "IRS") filed an amended proof of claim in Maurice's bankruptcy case asserting a secured claim for over $2.5 million and a general unsecured claim for more than $480,000

---

[3] The Court may take judicial notice of its own dockets. *See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir.1999) ("The bankruptcy court appropriately took judicial notice of its own docket.").

[4] The Wymans' collective commercial enterprise is referred to herein as the "business," unless a specific entity is named.

for unpaid income taxes for tax years as far back as 1993.  The IRS filed a similar proof of claim in Michael's bankruptcy case.

> ### B.   Maurice's Original Schedules and SOFA

Maurice, who is also known as "Mo" or "Moe," filed his original Schedules (the "Original Schedules") and Statement of Financial Affairs (the "Original SOFA") on December 16, 2014, signing them under penalty of perjury.  He testified at the § 341 Meeting that he had reviewed his bankruptcy paperwork carefully and that it was accurate, true, and complete.  Following the conclusion of the creditors' meetings, he filed, on May 20, 2015, amended Schedules A, B, C, D, E and F (collectively, the "Amended Schedules") as well as an amended SOFA (the "Amended SOFA"), signing them under penalty of perjury.  He did not amend his Schedules I or J.  Through his Amended Schedules and Amended SOFA, Maurice made several changes to his original disclosure of assets, liabilities, and financial affairs.  The disclosures which are the subject of this dispute are summarized below:

> #### 1.   Maurice's Original and Amended Schedules A and B

On his Original Schedule A -- Real Property, Maurice listed four properties as being owned "1/2 in Trust," including a single family residence located at 660 Main Street, Dennis, Massachusetts. On Original Schedule B -- Personal Property, Maurice, listed "None" in response to Question 2 requiring disclosure of financial accounts.  In response to the same question on Amended Schedule B, he listed two financial accounts 1) "50% of the money" in a checking account owned by Boston-Wyman, Inc. ($2,416.73);

and 2) "50% of the money" in a checking account owned by M and M Wyman Trust[5]

($438.70).

In response to Question 13 on Original and the Amended Schedule B, which

requires disclosure of interests in incorporated and unincorporated businesses, Maurice

disclosed the following, respectively:

| ORIGINAL SCHEDULE B[6]- QUESTION 13 | AMENDED SCHEDULE B- QUESTION 13 |
|---|---|
| Boston-Wyman, Inc. | 50% shareholder of Boston-Wyman, Inc. |
| Moe & Mike, Inc. | 50% beneficiary of M&M Trust |
| M&M Trust | 50% shareholder of North Street Management, LLC |
| Boston N, Inc. | 50% beneficiary of Wyman Massachusetts Business Trust |
| Boston N Beverly, Inc. | |
| Boston N Bridgewater, Inc. | |
| Boston N Barnstable, Inc. | |
| Mo and Mike Trust | |

As discussed further below, Maurice's disclosure in response to Question 13 in both the

Original and Amended Schedule B was incorrect in a number of respects.

In response to Question 21 on the Original Schedule B, which requires disclosure

of contingent and unliquidated claims of every nature, Maurice listed "None." In

response to the same question on Amended Schedule B, he disclosed a "Potential claim

---

[5] This trust was also referred to as "M&M Wyman Trust" in certain of the Wymans'
disclosures.  The Court will refer to the trust as "M&M Trust." The Wymans also used
different variations of corporate names of various business entities on their Schedules
and SOFA.  For purposes of this Memorandum, the Court will use the corporate names
of the various entities as set forth in the Chapter 11 case of Boston-Wyman, Inc., Case
No. 04-19799, which is discussed in further detail below.

[6] Maurice did not disclose any specific ownership percentage in the entities listed on
Original Schedule B and indicated only that his interests were held jointly.

against Jose Servano and American Contractors Design being handled by Michael Murphy, Esquire . . ." in an unknown amount, and he also listed that claim as exempt on his Amended Schedule C, in the amount of $26,194.57. Maurice listed "None" in response to Question 25 on both Original and Amended Schedule B which requires disclosure of automobiles and other vehicles.

### 2.   Maurice's Amended Schedule D and F

On his Amended Schedule D – Creditors Holding Secured Claims, Maurice listed the IRS as holding liens on all of the real properties he listed in his Schedule A.  On his Original and Amended Schedule F – Creditors Holding Unsecured Nonpriority Claims, Maurice listed Premier as having a "disputed" claim in an unknown amount arising from a lawsuit, and he listed the IRS and the Massachusetts Department of Revenue as the holders of claims totaling more than $3,250,000.  He listed total general unsecured claims at more than $4,100,000.

### 3.   Maurice's Schedules I and J

On Schedule I: Your Income, Maurice listed his employer as Benanna, LLC and listed the following in monthly income: $942.50 in gross wages, salary and commissions; $2,100 in Social Security income; and $1,000 designated as a "Contribution from Daughter" on line 8h of Schedule I entitled "Other monthly income."  On Schedule J: Your Expenses, he listed his wife and 39 year old son as dependents and set forth his monthly expenses as $4,040 and his monthly net income as -$290.56.  With respect to "Medical and dental expenses" on Line 11, Maurice listed $100.  As noted above, he did not amend Schedule I or J.

4. Maurice's Original and Amended SOFA

In response to Question 1 on the Original SOFA entitled "Income from employment or operation of business" Maurice reported the following:

| Amount | Source |
|--------|--------|
| $5,000 | Wages 2014 to Date |
| $22,251 | Income 2013 Tax Return |
| $5,860 | Income 2012 Tax Return |

Maurice did not amend this disclosure in his Amended SOFA. In response to Question 2 on the Original SOFA entitled "Income other than from employment or operation of business" Maurice reported the following:

| Amount | Source |
|--------|--------|
| $25,200 | Social Security, 2014 to Date |
| $26,477 | Social Security, 2013 |
| $4,366 | Social Security, 2012 |

Maurice did not disclose any monthly "Contribution from Daughter" in the Original SOFA as he did in his Schedule I, and he did not amend this disclosure in his Amended SOFA.

In response to Question 4a on his Original and Amended SOFA, entitled "Suits and administrative proceedings . . ." Maurice listed, among more than a dozen others, a civil proceeding with Premier which he described as "Pending." According to the case numbers of several of the lawsuits, some the actions were commenced as far back as 2008. In response to Question 14 of the Original SOFA, requiring a listing of all property owned by another person that the debtor holds or controls, Maurice listed "None." In response

to the same question on the Amended SOFA, Maurice disclosed a 2014 Mitsubishi

Outlander (the "Mitsubishi") as being in his possession and owned by Boston N, Inc.

In response to Question 18a of the Original SOFA, requiring the disclosure of

businesses in which a debtor has been an officer, director, partner, or managing executive,

or which he has held 5 percent or more of the voting or equity securities within six years

before the petition date, Maurice listed the following entities:

| Boston-Wyman, Inc. |
| M&M Trust |
| Boston N, Inc. |
| Boston N Beverly, Inc. |
| Boston N Bridgewater, Inc. |
| Boston N Barnstable, Inc. |
| Mo & Mike, Inc. |
| Mo and Mike Trust |
| Boston N Wareham, Inc. |

In response to the same question on the Amended SOFA, Maurice deleted references to

Mo and Mike Trust and added two new entities, namely Wyman Massachusetts Business

Trust and North Street Management, LLC.

On Question 19a on the Original SOFA, which requires disclosure of "all

bookkeepers and accountants who within **two years** immediately preceding the filing of

this bankruptcy case kept or supervised the keeping of books of account and records of

the debtor," Maurice listed "None."  In response to Question 19c on the Original SOFA,

which requires disclosure of "all firms or individuals who at the time of the

commencement of this case were in possession of the books of account and records of the

debtor[,]" Maurice also listed "None."  In response to Question 19a on the Amended

SOFA, Maurice listed William E. Synan, CPA of the firm of LMHS, P.C. as the "CPA that

prepared tax returns for various entities associated with from [sic] information provided by the Debtor and employees of the entities, not a "bookkeeper", never audited [sic]"

C.   The Amended Complaints

Premier, with leave of court, obtained extensions of the deadline to object to the Wymans' discharges.  On July 6, 2015, Premier timely filed separate complaints against the Wymans which contained one count for denial of discharge pursuant to 11 U.S.C. § 727(a)(4).  On September 17, 2015, the Court issued Pretrial Orders in each adversary proceeding.  On September 21 and 22, 2016, Premier took the deposition of Michael and Maurice, respectively.  Premier also deposed Cheryl Crowell-Wilkins, who is Michael's wife, Renee Dowling, who is Maurice's daughter, Josh Wyman, who is Michael's son, and LMHS, P.C., an accounting firm and the employer of accountant William E. Synan, CPA. On October 28, 2016, the parties filed their Joint Pretrial Memoranda in each adversary proceeding in which they admitted certain facts.  On December 1, 2016, Premier, with the assent of the Wymans, filed assented to motions to consolidate the adversary proceedings for trial which the Court allowed the next day.

On February 14, 2017, Premier filed in both adversary proceedings a motion for leave to amend the original complaints to add an additional count for denial of discharge pursuant to 11 U.S.C. § 727(a)(2) and to add additional factual allegations in support of its claim under § 727(a)(4) against Michael (jointly, the "Amended Complaints").  The Court allowed the motions to amend on March 1, 2017, in the absence of any objections. The Wymans each filed Answers to the Amended Complaints on March 3, 2017.  The Court conducted a consolidated trial on the Amended Complaints beginning on March

6, 2017, and the parties agreed at the outset of the trial that amendment of their Joint

Pretrial Memoranda was not necessary despite the filing of the Amended Complaints.

## III. FACTS ADDUCED AT TRIAL

### A.  The Witnesses

Premier called six witnesses at trial and introduced 38 exhibits; the Wymans called

no witnesses and introduced only two exhibits. Maurice is 71 years old, holds a college

degree in education, is married and has two adult children, Renee Wyman Dowling

("Renee") and Reid Wyman ("Reid").  Michael attended college for three years, is married

to, but separated from, Cheryl Crowell-Wilkins ("Cheryl"), has two adult children, Josh

Wyman ("Josh") and Rachel Wyman, ("Rachel") and a minor child with Cheryl.   Cheryl

holds a Master's Degree in public health and is employed at a domestic violence agency.

Renee has a college degree in education and is an assistant kindergarten teacher, a

position she has held for the past seven years.

Maurice's testimony at the § 341 Meeting and at trial reflected that he was

frequently confused about the various business entities that operated the family business.

He also exhibited confusion about the timing of certain critical events, most notably

numerous legal proceedings which involved him and the business as well as the transfer

of certain ownership rights in the business that occurred after 2006.  He testified that he

often signed legal documents without reviewing them based upon the advice of counsel

or accountants, and he often blamed his inaccurate disclosures on others, including his

bankruptcy attorney and that attorney's paralegal.  He also attributed his incomplete and

inaccurate disclosure to faulty memory and the complex structure employed by his

lawyers and accountants to operate the business: "You know, all this is a blur. There were like 50 companies in that period of time and I don't remember the dates or the answers to everything." At trial, he often stated "I'm not a lawyer" and "I am not an accountant" to deflect responsibility for misstatements and omissions.

Michael also exhibited frequent confusion about the various business entities that operated the family business and failed to remember the correct dates of certain critical proceedings and transactions. When confronted with errors and omissions in his Schedules and SOFA and prior deposition testimony, he often testified that he failed to understand the question involved. He consistently maintained throughout the trial that he "did his best" with his required disclosures, but he did not have command of the details of his financial affairs. He instead spoke mainly in generalities about his complex financial history and affairs. He also admitted to not reading legal documents thoroughly and attributed some of his disclosure errors to his counsel's office.

Cheryl credibly testified about her limited role in the business and matters she facilitated for Maurice and Michael. Renee's general statements about her involvement in the business were mostly credible, although she carefully provided brief answers to questions and avoided giving details when possible. She appeared conflicted when testifying about the family business, her father, and uncle.

B. <u>The Business</u>

In 1970, after receiving training from Burger King Corporation in Florida, Maurice, with Michael and their uncle, opened a Burger King franchise in Hyannis, Massachusetts. In 1977, Maurice and Michael, as equal owners, purchased another Burger King franchise

12

in Yarmouth, Massachusetts.  Throughout the 1980s, the brothers continued to acquire restaurants throughout Massachusetts, all of which were operated by Boston-Wyman, Inc. ("Boston Wyman"), in which each held a 50% interest.  The real estate from which the restaurants operated was separately owned or managed by a number of corporations in which Maurice and Michael each held a 50% interest, namely Boston N Wareham, Inc., Boston N Beverly, Inc., Boston N Bridgewater, Inc. and Boston N Barnstable, Inc. (collectively, the "Boston N Entities").  The sole source of income of the Boston N Entities was rental income paid by the restaurant franchises located on the land they owned or managed.   A separate entity, Boston N, Inc., also owned equally by the Wymans, was formed to submit requests for proposals (RFPs) to the Commonwealth of Massachusetts, and it held leases for highway plazas land owned by the Commonwealth of Massachusetts.  From the 1970s through the mid-2000s, Maurice and Michael were the sole owners of Boston Wyman, the Boston N Entities and Boston N, Inc.  At some point in the mid-2000s, the companies controlled by Michael and Maurice owned 22 restaurants in eastern Massachusetts, which generated over $20 million a year in gross revenues and employed several hundred workers.

C.  The Chapter 11 Cases

On December 3, 2004, Boston Wyman, the Boston N Entities and another affiliated corporation called Mo & Mike, Inc. (collectively, the "Chapter 11 Debtors") each filed voluntary petitions under Chapter 11 of the Bankruptcy Code, and their cases were

jointly administered.[7]   Maurice testified that the Chapter 11 Debtors' bankruptcy filing was caused, in part, by fraud perpetrated by the companies' accountant which caused the entities to incur substantial tax liabilities to the federal government and the Commonwealth of Massachusetts which were imputed to Maurice and Michael and for which they remain personally liable.

The Chapter 11 Debtors filed a Fifth Amended Joint Plan of Reorganization (the "Chapter 11 Plan") on February 14, 2007, which was confirmed by the Court (Hillman, J.) on February 16, 2007.   Pursuant to Section 3.2 of the Chapter 11 Plan, the reorganized operating debtors agreed to assume obligations under existing franchise agreements with Burger King Corporation ("BKC"), relating to restaurant operations at 16 locations in Massachusetts.   Pursuant to Section 3.4 of the Chapter 11 Plan, the stock in the Chapter 11 Debtors was canceled, such that Maurice and Michael no longer directly owned them, and new stock in the Chapter 11 Debtors was issued to two new entities: 1) North Street Management, LLC which was organized to hold and own equity interests in the so-called Operating Debtors (Boston Wyman and Mo & Mike, Inc.); and 2) Benanna, LLC ("Benanna") which was organized to hold and own the equity interests in the so-called Real Estate Debtors (consisting of the Boston N Entities).

As set forth in Section 1.53 of the Chapter 11 Plan, North Street Management, LLC was owned 90% by the Wyman Children (consisting of Reid, Renee, Rachel and Josh),

---

[7] Boston N, Inc. was not a debtor.

equally, and 5% each by Maurice and Michael as follows:

| North Street Management, LLC | |
|---|---|
| Name | Percentage Ownership |
| Reid | 22.5% |
| Renee | 22.5% |
| Josh | 22.5% |
| Rachel | 22.5% |
| Maurice | 5% |
| Michael | 5% |

As set forth in § 1.59 of the Chapter 11 Plan, Benanna, LLC was owned 95% by the Wyman

Children, equally, and 2.5% each by Maurice and Michael:

| Benanna, LLC | |
|---|---|
| Name | Percentage Ownership |
| Reid | 23.75% |
| Renee | 23.75% |
| Josh | 23.75% |
| Rachel | 23.75% |
| Maurice | 2.5% |
| Michael | 2.5% |

Following confirmation of the Chapter 11 Plan, Maurice and Michael no longer

directly owned the Chapter 11 Debtors on a 50/50 basis. Instead, they became minority

owners with their children of an operating company (North Street Management, LLC)

and a real estate management company (Benanna).   Pursuant to Section 12b of the

Chapter 11 Plan, Maurice and Michael were each to receive annual base salaries and other

distributions up to an amount not to exceed $125,000 from the Chapter 11 Debtors.

D.  The Burger King Litigation

Two years after confirmation of the Chapter 11 Plan, in the spring of 2009, BKC

filed a complaint against North Street Management, LLC, Boston Wyman, Mo and Mike,

Inc., Maurice, Michael, Josh and Reid in the United States District Court for the Southern

District of Florida, through which it alleged, *inter alia*, that defaults occurred under the Chapter 11 Plan and that Maurice and Michael had overpaid themselves from 2007 through 2009 (the "Burger King Litigation").

      E.   Transfer of Equity in Benanna and Sale to LBK, LLC

To settle the Burger King Litigation, Maurice testified that the Wymans and their sons agreed to divest themselves of their equity in Benanna and then sell the remaining 16 operating restaurants to a company called LBK, LLC ("LBK"),[8] although both Maurice and Michael exhibited confusion at trial about whether the transfer and sale agreement was related to the prior Chapter 11 case.  On May 14, 2009, Maurice, Michael, Josh and Reid executed a series of Benanna Membership Interest Assignments (the "Assignments") transferring all of their equity in Benanna to Renee and Rachel (who each already owned 23.75% of Benanna) "in consideration of estate planning" which resulted in the following transfers of Benanna equity (the "Benanna Transfers"):

**Benanna, LLC**

| Transferor | Equity Percentage | Transferee |
|---|---|---|
| Maurice | 2.5% | Renee |
| Michael | 2.5% | Rachel |
| Reid | 23.75% | Renee |
| Josh | 23.75% | Rachel |

| Name | Resulting Ownership |
|---|---|
| Maurice | 0% |
| Michael | 0% |
| Reid | 0% |
| Josh | 0% |
| Renee | 50% |
| Rachel | 50% |

---

[8] No settlement agreement with BKC was introduced into evidence.

According to Maurice, Rachel later transferred her 50% interest in Benanna to Cheryl, Michael's wife, resulting in a 50/50 ownership of Benanna by Renee and Cheryl. Maurice testified that the Benanna Transfers were effected to settle the Burger King Litigation and that the arrangement was not a "mechanism . . . to continue to control [the] companies and receive distributions from those companies." When asked at trial why he failed to reference settlement of the Burger King Litigation as consideration for the Benanna Transfers in the Assignments, instead of "estate planning," he testified that he did not read the assignments before he signed them and that "I did what the attorneys told me to do, sir."

Pursuant to a Purchase and Sale Agreement dated October 30, 2009, North Street Management, LLC and several of its affiliates sold 16 Burger King restaurants to LBK for $11.5 million.  Despite the sale of the restaurants, the Wymans' business continued through Benanna which managed and controlled a number of leases with non-Wyman owned restaurants located on Massachusetts highway sites.

F.  The Premier Judgment

Premier, a successor in interest to a lender of Boston Wyman, sued Maurice, Michael, Boston Wyman and a number of other entities in January 2010 in the Middlesex Superior Court, Department of the Massachusetts Trial Court and, after trial, obtained a judgment on June 11, 2013, jointly and severally against all defendants, in the amount of $1,020,555.93 for damages, plus attorneys' fees and costs of $123,240.53 (the "Premier Judgment"). On May 9, 2014, Premier obtained an Order for Post-Judgment Injunctive Relief restraining the defendants, including Maurice and Michael, from transferring

assets other than for ordinary household expenses. Benanna, Boston N, Inc., and the

Boston N Entities, who were not defendants in this litigation, were not restrained from

making any transfers. Both Maurice and Michael attributed the Premier Judgment to

having poor legal counsel. Premier engaged in post-judgment discovery to collect its

judgment and ascertain any assets or accounts which were controlled by the Wymans.

On November 18, 2014, the Superior Court issued a Contempt and Sanctions Order

against Maurice and Michael for their failure to comply with post-judgment discovery.

Two days later, on November 20, 2014, the Wymans filed their Chapter 7 petitions.

G.  Management and Operations of Benanna

Maurice, Michael, Cheryl and Renee each offered their account of the management

and operations of Benanna following the Benanna Transfers in 2009.  Josh also testified

about Benanna but maintained that he had almost no recollection about its business or

his ownership or role in it. In response to questions about Benanna, he repeatedly

testified: "That was a long time ago. I really don't recollect."

1.  Benanna-Maurice's Account

Maurice testified at trial that he started working for Benanna in January 2010

following the restaurant sale to LBK. He testified at his deposition that he performed

"property management" at certain highway sites controlled by Benanna but also testified

at the § 341 Meeting that he had been the "bookkeeper" for Benanna which, he testified

at trial, was "the same thing [as being a property manager.]"  Maurice testified at his

deposition that he handled many duties for Benanna including paying bills, making

deposits, and initiating wire transfers but that he did not sign Benanna checks because he

did not have check signing authority.  At trial, however, Maurice contradicted himself and testified that he did have Benanna check signing authority but that such authority was "taken away" on a date he could not recall.  Maurice acknowledged signing Benanna checks after Premier introduced at trial numerous Benanna checks from 2012 through 2014 made payable to cash which were signed and negotiated by Maurice.

Despite Maurice's characterization of his role at Benanna as a "bookkeeper" at the § 341 Meeting, he testified at trial that he and Michael ran the company's day-to-day operations. He added that he would visit Burger King restaurant tenants located on properties managed by Benanna, that tenants would call him or Michael after hours if problems arose, and that they were both on call "24/7." Maurice testified that he and Michael were paid $250 per week for this work which was later increased to $500 plus a car, gas, and insurance.

Notwithstanding Maurice and Michael's operational duties for Benanna, Maurice testified that he believed he was ultimately answerable to Cheryl and Renee as the owners of Benanna.  He also testified that Cheryl initiated numerous conversations with him when she had questions, and that he frequently asked Cheryl and Renee for instructions and permission when business decisions had to be made. He denied that he used Benanna to conceal or shelter money from his creditors.

2.  Benanna-Michael's Account

Michael testified at his deposition that he was not a bookkeeper for Benanna but testified at the § 341 Meeting that he did serve as the company's bookkeeper and property manager. He also testified at trial that he worked for Benanna after the 2009 restaurant

sale.  When asked at trial who ran Benanna, Michael replied: "Well, we worked for Renee and Cheryl," but that he and Maurice shared responsibility for its day-to-day management.

### 3.  Benanna-Cheryl's Account

Cheryl recounted a more limited role for herself in Benanna than described by Maurice and Michael.  She testified that she was an owner of Benanna but that she never worked or held a job with the company and that she had separate employment at a domestic violence agency on Cape Cod.  She could not recall the exact year she became an owner, although her tax returns reflect that she has reported half the distributions generated by Benanna as income since 2009.  She testified that she became an owner of Benanna because "Mike and [Maurice] had their situation and the business had a situation and because of things that happened they needed to have other owners. . . ." She testified that she was given 50% of the equity in Benanna for no consideration. She credibly testified that she did not know the names of any officers, managers or attorneys of the company, that she received all information about Benanna from Maurice and Michael, and that neither she nor Renee were actively involved in Benanna's business. She added that Michael and Maurice decided what Benanna bills to pay, what equipment and vehicles to purchase, and whether to move funds from Benanna to related entities. She agreed that they did not confer with her about anything related to Benanna during the time she was an owner.  She maintained that she had no understanding of the debts that Benanna owed but simply knew that "money came in [and] money went out" based on what Michael told her.  Contrary to Cheryl's description of her limited role in Benanna,

Michael maintained that he and Maurice spoke with Cheryl many times about the business.

Cheryl testified that she never issued any Benanna checks made payable to cash or took any cash out of Benanna but that Michael and Maurice did. She testified that she cautioned them against doing so, but they did not heed her advice. She agreed that they operated Benanna and the Boston N Entities "the way they saw fit without regard to any direction from [her] or Renee." She was shown a number of Benanna checks drawn on a TD Bank checking account in 2015, after the Wymans' petition date. These checks were made payable to cash, to creditors, and to Cheryl and were signed with her name, but she testified that she believed Michael signed and endorsed her name on those checks and that he cashed them with her knowledge.

Michael testified that he had check writing authority on the Benanna checking account for some period of time but he could not remember how long. When asked at trial how many Benanna checks made payable to cash he cashed, he testified that he could not recall. When shown numerous Benanna checks from 2013 and 2014 made payable to cash totaling thousands of dollars and bearing Michael's signature and endorsement, he acknowledged that he signed the checks, cashed them and/or deposited them into Cheryl's bank account. He explained his use of the funds: "[I]t was [Cheryl's] distribution from Benanna, LLC, which she legally took and . . . paid taxes on and allowed me and her to take care of our household expenses and raise a child." He denied that he was making regular payments to himself out the Benanna account or that the Benanna funds

were his money.   Instead, he maintained that the Benanna funds were Cheryl's

distributions which were used for household expenses for the benefit of their family.

### 4.  Benanna-Renee's Account

Renee testified that she became a 50% owner in Benanna in May of 2009 and that

she had previously owned a smaller interest in the company.   When asked whether she

became a 50% owner as a result of the Burger King Litigation, she replied that she was

"not familiar with those things." She testified that she was "given" the additional equity

in Benanna but could not recall whether she received the transfers from the other Wyman

Children or otherwise.   She maintained that she signed checks on Benanna's behalf and

that she "did things" for the company, although she could not recall what they were and

provided few details of her role with Benanna.   She testified that Maurice wrote and

cashed Benanna checks made payable to cash.

Renee testified that she was an "employee, co-owner" of Benanna and had some

familiarity with its business of managing properties. She acknowledged, however, that

she previously testified at her deposition in 2016 that she was not an employee of the

company.   She agreed at trial that Cheryl also was not an employee of Benanna. When

asked about the nature of the work done by Maurice and Michael for Benanna, Renee

testified that they travelled to different store locations, sometimes in the middle of the

night, and handled matters she and Cheryl could not.   She stated: "we're not the kind of

people [who could] leave our jobs to do what needs to be done during a regular

workday." Renee testified that Maurice and Michael ran the day-to-day operations of

Benanna but that they consulted her on some matters, such as repairs and contractor issues, although she provided scant detail.

H. Renee's Benanna Distributions

According to Schedules K-1 to Benanna's tax returns, Renee received distributions of $247,512, $287,459 and $229,307 from Benanna in 2012, 2013 and 2014, respectively. Renee and Maurice both testified that Renee regularly gifted her after-tax distributions to Maurice. She testified that she cashed Benanna checks made payable to her and then remitted funds to Maurice, and that Maurice also cashed Benanna checks made payable to cash and retained the funds. She testified that she permitted and encouraged Maurice to benefit from her interest in Benanna.

On November 30, 2014, two weeks *before* Maurice filed his Original Schedules and SOFA, Maurice sent to William E. Synan, CPA ("Mr. Synan"), a longtime accountant affiliated with the Wymans and their business, a list of Benanna "Transactions by Account" listing checks issued by Benanna from January 13, 2011 through December 16, 2013, made payable to cash or Renee (the "Report") with a cover sheet signed by Maurice which provided:

> [T]hese are the numbers per year of money gifted to me by Renee.  After tax dollars!  Didn't start until 2/24/10. On Social Sec. before that.  Can you please jump on the tax notices by year so we can send them in. Mo."

The Report, which provided information so that several years of gift tax returns could be completed, reflects that Renee gifted Maurice $86,675 in 2011, $113,300 in 2012 and $99,995 in 2013.   These amounts are consistent with Renee's gift tax returns and

accompanying schedules for those years, all of which are dated December 3, 2014, although the returns reflect that the foregoing amounts were split between Maurice and his wife Cynthia.  Renee's 2014 gift tax return and accompanying Schedule A reflects that she gifted Maurice $133,383 in cash for that year, and Maurice testified at trial that he received those funds in 2014 prior to the petition date of November 20, 2014. Renee testified that she believed the amounts listed on her gift tax returns for 2011 through 2014 were accurate.

Renee agreed that she did not file contemporaneous gift tax returns regarding the funds she gifted to Maurice in 2011 through 2013 and that she filed the gift tax returns significantly after the due date for those years.  On cross-examination, she testified that she filed contemporaneous gift tax returns for 2007 and 2008, before the Benanna Transfers were effected.  She maintained that her filing of gift tax returns was not the product of "sudden scurrying around" and that the timing of the filings was dependent on a variety of factors.

I.    Cheryl's Benanna Distributions

Cheryl testified that she, along with Renee, received half of the distributions from Benanna. According to Schedules K-1 to Benanna's tax returns, Cheryl received distributions of $290,757, $290,683 and $146,575 from Benanna in 2012, 2013, and 2014, respectively.

Cheryl testified that Michael deposited her distributions into a checking account held in her name at First Citizens Bank (the "Citizens Account"). According to Cheryl, Michael would regularly sign her name to checks from the Citizens Account, with her

knowledge, to pay household bills and that he did so even after the couple separated.

She testified that household bills for the couple's home located at 66 Channel Point Road

in Hyannis, Massachusetts were paid from the Citizens Account, that Michael's

individual household bills were also paid from that account after the couple separated in

2013. Cheryl maintained that she did not monitor the Citizens Account to keep track of

deposits or withdrawals even after she separated from Michael and that she deposited

the paychecks from her regular job into a separate account with E*Trade Bank to which

Michael had no access.

Michael testified at trial that distributions received by Cheryl from Benanna "were

not my distributions" and "not my money." He maintained that Cheryl allowed him to

deposit her distributions into her Citizens Account to be used to pay for household

expenses. He further maintained that he "did not withdraw anything from Benanna" but,

instead, was simply allowed by Cheryl to deposit her distribution checks into her

checking account. He consistently maintained that Chery's distributions were not "my

money" although they were used to benefit him and his family.

J.   Testimony of William Synan

Mr. Synan, who, as noted above, is a CPA with the accounting firm of LMHS, P.C.,

testified that he has worked with Michael and Maurice for at least 25 years, and, during

that time, his firm has provided financial statement audits for the business and prepared

personal tax returns for Michael and Maurice as well as gift tax returns for Renee. He

testified that his firm retained hard and digital copies of Wyman records for preparation

of tax returns. At his deposition and at trial, Mr. Synan testified that Maurice and Michael

were the primary decision makers for the business after the restaurant sale to LBK in 2009. With respect to the Report sent to him by Maurice on November 30, 2014 regarding Renee's gift tax returns from 2011 through 2013, he testified that the gift tax returns for those years were filed after their due date but there was no penalty for the late filing.

K.  Bank Accounts of Boston Wyman and M&M Trust

Maurice testified at trial that Boston Wyman was not doing any business after 2009 and that, prior to his bankruptcy filing, he "let it die by just not doing anything about it." He denied using Boston Wyman accounts to pay personal bills or buy assets. At his deposition, Maurice admitted that he "emptied out" the Boston Wyman account some time in 2015 because he thought he "owned" the account and considered the funds, consisting of $2,800, to be "his." He denied sheltering his income through Boston Wyman but also testified that he "could have" deposited sums he received from Renee into the Boston Wyman bank account. Additionally, Michael testified that some of the money used to pay his bankruptcy counsel came from the Boston Wyman account.

M&M Trust, of which Maurice and Michael were both beneficiaries, owned a single family home located at 660 Main Street, Dennis, Massachusetts (the "Dennis property"), which was rented to a tenant. Maurice and Michael listed that property on their respective Schedule A as being owned "1/2 in trust."  The Trustee examined the Wymans at the § 341 Meeting about the tenant's rent checks deposited into M&M's bank account.  At the § 341 Meeting and at trial, Maurice acknowledged that he had issued checks after the petition date from the M&M Trust bank account relating to the maintenance of the Dennis property.

L.  The Vehicles

At trial, Maurice and Michael testified that they caused Boston N, Inc. to purchase and finance three cars in September 2014, approximately six weeks prior to their bankruptcy filing, for Maurice (the Mitsubishi), Michael (a Subaru) and Reid (a Cadillac) (collectively, the "Vehicles").  Michael testified that he co-signed or guaranteed the Vehicle loans for Boston N, Inc. Premier introduced two Benanna checks dated September 2 and 3, 2014, made payable to cash in the amount of $3,000 and to Boston N, Inc. in the amount of $4,000, respectively.  Maurice signed both checks and testified that those Benanna funds were used for the down payments on the Vehicles.  He further testified that he transferred those funds from Benanna to Boston N, Inc.  Cheryl testified that she was not advised by Michael or Maurice of any car purchases prior to their bankruptcy filings. Likewise, Renee also testified that she did not authorize Maurice to purchase the Vehicles with Benanna funds.

M. Failure of Benanna

Maurice testified at trial that he continued to work at Benanna through March 2015, when, after many tenants failed to pay their rent, the Commonwealth of Massachusetts advised Benanna and its tenants that it was going to revoke Benanna's RFP award, causing Benanna to fail.

N. Maurice's Testimony Regarding Original and Amended Schedules and SOFA

Maurice, who signed the Original and Amended Schedules and SOFAs under penalty of perjury, testified at the § 341 Meeting that he had reviewed his original bankruptcy paperwork carefully and that it was accurate, true and complete.  Following questioning from the Trustee and creditors at the § 341 Meeting, he filed the Amended Schedules and an Amended SOFA.  He conceded at trial that he often failed to proof read documents that he signed at the direction of an attorney or accountant, and that he made disclosure "mistakes" which his attorney did not catch.  He also frequently blamed certain errors in the Schedules and SOFAs on his attorney and paralegal.  Premier highlighted at trial numerous inaccuracies in Maurice's Original and Amended Schedules and SOFAs. His most material errors and omissions are set forth below.

1.   Maurice's Original and Amended SOFA

Maurice disclosed in response to Question 1 on his Original and Amended SOFA that he earned $5,000 in wages through his petition date in 2014 and $25,200 in Social Security income for the same time period in response to Question 2.  He did not list any "gifts" from Renee in his Original or Amended SOFA, despite the fact that he disclosed $1,000 in "Other monthly income" from his daughter in his Schedule I, as discussed below.

Maurice listed the Premier lawsuit as "Pending" in response to Question 4a of his Original and Amended SOFA despite the fact that Premier secured its Judgment in 2013. He testified that he listed the matter as pending because he thought, incorrectly, that there was an outstanding appeal or a motion for reconsideration of the Premier Judgment.

Maurice did not list an automobile in response to Question 25 of his Original

Schedule B (automobiles and other vehicles) or in response to Question 14 of his Original

SOFA as "property owned by another person that the debtor holds or controls." When

asked by the Trustee at the § 341 Meeting how he arrived at the meeting, he replied that

he used the Mitsubishi which he inaccurately testified was owned by Benanna, rather

than Boston N, Inc.  Following the § 341 Meeting, he disclosed the Mitsubishi in his

Amended SOFA.  At trial, Maurice testified that he kept the Mitsubishi at his home and

personally used it so that he could "do the work necessary for Benanna." When asked at

trial about his failure to disclose the Mitsubishi as an item he controlled in the Original

SOFA, he testified that he made the postpetition loan payments on the car and did not

list it "because probably I was paying for it at that time."  He also testified that Benanna

made the first ten payments on the Mitsubishi loan prior to his bankruptcy filing despite

the fact that he filed his bankruptcy petition less than two months after Boston N, Inc.

purchased the Mitsubishi.  He summed up his failure to list the Mitsubishi on the Original

SOFA: "I just forgot.  I made a mistake. But I disclosed to everybody at the [§ 341] meeting

there was a company car . . . everybody knew about it."

In response to Question 18a of Maurice's Original SOFA, he failed to disclose any

interest in, or managerial position with, North Street Management, LLC, in which he and

Michael each owned a 5% interest.  However, he later disclosed it in response to the same

question in his Amended SOFA after being questioned about it by the Trustee at the §

341 Meeting.  At the § 341 Meeting, he testified that the LLC was "non-existent." At trial,

he first testified that he did not own any interest in the LLC, but then became confused

about whether it was actually owned by Benanna.  When shown a copy of North Street

Management LLC's 2014 Annual Report filed with the Commonwealth of Massachusetts,

dated December 4, 2014, bearing Maurice's electronic signature and reflecting that he was

a manager of that entity, Maurice denied signing the Annual Report and testified that he

had given an accountant authority to electronically sign his name.

Maurice was questioned by Premier at the § 341 Meeting about why he did not

disclose an accountant or bookkeeper who kept his books and records in his Original

SOFA, to which he responded: "I missed that." With respect to Maurice's failure to

disclose Mr. Synan as an accountant in response to Question 19a on his Original SOFA,

Maurice testified at trial that Mr. Synan was his "accountant" but never audited or "kept"

his books.  Maurice was unable to explain why he failed to disclose Mr. Synan in his

Original SOFA, although he previously identified him as his accountant/bookkeeper in

his answer to Premier's post-judgment interrogatories in November 2014.  In the Joint

Pretrial Memorandum submitted by the parties, Maurice admitted that he failed to list

his accountant in response to Question 19 of the Original SOFA.

2.  Maurice's Original and Amended Schedule B

Maurice listed "None" in response to Question 2 on his Original Schedule B with

respect to financial accounts and testified at trial that he had no personal bank account

when he filed his bankruptcy petition in November of 2014 because "any monies that I

had put in an account prior [to the petition date] the State of Massachusetts had seized .

. . ." In Maurice's Amended Schedule B, he disclosed a 50% interest in a checking account

owned by Boston Wyman, an entity he did not own, and a 50% interest in a checking

30

account owned by M&M Trust.  When asked at trial why he disclosed a bank account owned by Boston Wyman, Maurice attributed the inaccuracy to "over disclosing assets." When asked why he did not list the M&M Trust bank account on his Original Schedule B despite listing the Dennis property in his Schedule A, Maurice replied: "I don't know why. It was done that way and it was done that way from the beginning and the trustee knew."

With respect to Maurice's listing of the Boston N Entities in response to Question 13 of his Original Schedule B (which were later removed on Amended Schedule B), Maurice testified at trial that he did not own those entities and that they were, in fact, owned by Benanna, although he demonstrated some confusion about the matter. Likewise, he demonstrated confusion at trial about the ownership of North Street Management, LLC when questioned why he disclosed being a "50% shareholder" of that LLC in response to Question 13 of his Amended Schedule B, notwithstanding that it is a limited liability company and that he owned only 5% of the entity.

Maurice failed to list any contingent unliquidated claims in response to Question 21 on his Original Schedule B but added a personal injury claim against Jose Servano and American Contractors Design resulting from a car accident (the "Personal Injury Claim") to his Amended Schedule B, which he also claimed as exempt on his Amended Schedule C in the amount of $26,194.57, after the Section 341 meeting.  He testified at trial that he failed to list the Personal Injury Claim on his Original Schedule B because he had not sued anyone yet: "It was not a claim.  There wasn't even a thought of a claim" and added that the matter was one of semantics: "A claim to me is when I actually go to somebody

and file a claim." He added that "Claims are things that have been already made or in the process of hiring an attorney and formed an opinion that this lawsuit would go on forward [sic]." He maintained this position even though he said he suffered a shoulder injury as a result of the accident which might require surgery. He testified that he realized after the § 341 Meeting that his disclosure needed to be corrected and that the claim needed to be listed. On February 17, 2016, the Trustee filed a Motion to Approve Interim Settlement of Personal Injury Action through which she sought approval of a settlement resulting in a net distribution to the estate of not less than $31,000, subject to an allowable exemption asserted by Maurice. The Court approved the motion on March 11, 2016.

3. Maurice's Schedule I

At the § 341 Meeting and at trial, Maurice testified that Renee made contributions to him from her Benanna distributions to help him live. Despite receiving $133,383 in cash gifts in 2014 from Renee's Benanna distributions, he reported on his Schedule I filed on December 16, 2014 that he received on a monthly basis $942.50 in gross wages, $2,100 in Social Security income and $1,000 in "Other monthly income" ($12,000 annually) which he described as "Contribution from Daughter." In response to Question 1 of the Original and Amended SOFA entitled "Income from employment or operation of business," Maurice reported $5,000 in wages in 2014 through the petition date of November 20, 2014. In response to Question 2 entitled "Income other than from employment or operation of business," he reported only Social Security income of $25,200 in 2014; he did not list any contribution from Renee.

At trial, Maurice testified that he did not report the entire $133,383 he received from Renee in 2014 on his Schedule I or in his Original or Amended SOFA because those funds were not "income" or "earnings" on which he paid taxes but were, rather, a gift. He added that he took this position based on advice from his accountant and that his attorney should have advised him if this was wrong.

When asked at trial to explain why he listed the $1,000 "Contribution from Daughter" as "Other monthly income" on line 8h of Schedule I but did not list such amount on the Original or Amended SOFA, Maurice provided confusing testimony.  He testified at one point that the $1,000 amount listed on Schedule I was an "estimate" of gifts he might receive from Renee in the future: "It's not money that's been given to me yet." He also asserted at another point that the amounts he received from Renee varied and that she had told him she would give him no more than $1,000 per month.  He maintained these positions even though he had specific updated gift amounts as reflected in the Report which he sent to Mr. Synan on November 29, 2014, two weeks before Maurice filed his Schedule I.  He failed to amend his Schedules I and J.

Maurice offered similarly confusing testimony about the timing of his receipt of cash gifts from Renee.  At one point, he testified that he received the gifts only prior to his bankruptcy filing and at a later point he testified that he may have received cash gifts from her after the petition date. He then conceded he did not know the last date he received a cash gift from her.

4.   Maurice's Schedule J

When asked at trial what he did with the $133,383 in cash gifts he received from

Renee in 2014 and his 2014 wages and Social Security income listed on Schedule I (totaling

approximately $165,000), he replied that he used it to pay bills even though he reported

his monthly expenses as $4,040 ($48,480 per year) on his Schedule J. Maurice explained

that he paid several bills during the course of the year, including legal bills and medical

expenses for his disabled son who lives with him and for his wife, which were not

reflected on his Schedule J because they were not "his" bills.   He clarified that the only

expenses he listed on Schedule J were the ones he incurred during the month preceding

the petition date.   He testified that he spent, on average, at least $2,000 per month on his

son's medical bills.   When asked why he scheduled only $100 on his Schedule J for

medical expenses, he testified that such amount was for "his" medical bills and that he

completed his Schedules I and J for income and expenses "going forward" with respect

to most items and did not list items that "happened in the past," although he did use an

"historical average" on Schedule J for rent and utility expenses.   He did not make any

notations or designations on his Schedules I and J of his different methodologies for

listing income and expenses.   He denied that he underreported his expenses in Schedule

J to hide the income he received from Renee.

In sum, Maurice maintained at trial that he had accurately testified about his assets

and liabilities but that he had "definitely made mistakes."   He maintained that he has

concealed no property, destroyed no assets, transferred no property prior to 2009 and

that he completed his Schedules to the best of his ability and recollection at the time he

34

signed them: "You know, I took the time to think about the answers to the questions that

[counsel] asked at the time to the best of my ability. If it was incorrect or a date is wrong

or a name is wrong, I did my best and I did it truthfully."

## IV. POSITIONS OF THE PARTIES

A.     Premier

Premier contends that the Wymans' discharges should be denied pursuant to §

727(a)(4)(A) because each made multiple false oaths in their Schedules and SOFAs and

during the § 341 Meeting and pursuant to § 727(a)(2)(A) because each concealed and

transferred assets, namely hundreds of thousands of dollars in Benanna income, to

themselves through their family members since 2010, citing numerous cases, discussed

below, in support of its position.

B.     Maurice

Maurice argues that denial of his discharge under § 727(a)(2)(A) or (a)(4)(A) is

unwarranted because his behavior, responses, testimony and actions did not "rise to the

level necessary to deny a discharge" under those sections. He maintains that errors in the

Schedules and SOFAs were innocently made and timely corrected by amendment or

amounted to "over disclosure."  He adds that the errors were in the nature of "immaterial

misunderstandings," that the Wymans "could not honestly remember what small

percentage interest they held in the reorganized company after . . . 2007" and that "to

them it was all a blur" from 2004 to 2009.

Maurice maintains that the Benanna Transfers occurred in 2009, more than five

years prior to his bankruptcy filing, and were not motivated by an intent to defraud any

creditor. He acknowledges that he and Michael "ran the day to day management and oversight of the highway locations." He also concedes in his post-trial brief that most, if not all, of the net income from Cheryl's interest in Benanna "was either written directly out to . . . Michael in the form of checks or deposited into her [Citizens Account] . . . and thereafter controlled by Michael" for living expenses. Likewise, Maurice concedes that most, if not all, of the net income from Renee's interest in Benanna was gifted to him and his wife. He asserts that no court order precluded Renee and Cheryl from disposing of Benanna profits in such fashion and that the Wymans disclosed the assistance they received on their respective Schedule I. Maurice cited no case law in support of any of his positions.

## V. DISCUSSION

### A.   General Findings

For the reasons stated below, the Court finds that despite Maurice and Michael's testimony to the contrary and their transfer of their interest in Benanna in 2009, they exercised complete control over its business and received hundreds of thousands of dollars a year as de facto owners, disguised as "household contributions" and "gifts" from Renee and Cheryl for the purpose of keeping those monies from the reach of their many creditors, including Premier. Further, the Court finds that Maurice and Michael underreported their actual income from Benanna in their Original and Amended Schedules and SOFAs and that they made numerous other additional errors, omissions and misrepresentations in their disclosures submitted to the Bankruptcy Court and at the

§ 341 Meeting, constituting knowing and fraudulent false oaths for the purposes of 11

U.S.C. § 727(a)(4)(A).

B.    Burden of Proof

The denial of a debtor's discharge under § 727 requires proof of grounds for such

relief by a preponderance of the evidence. Barclays/Am. Bus. Credit, Inc. v. Adams (In

re Adams), 31 F.3d 389, 394 (6th Cir. 1994), cert. denied, 513 U.S. 1111 (1995) (applying the

rationale of Grogan v. Garner, 498 U.S. 279, 291, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991) to

§ 727 actions) (the preponderance of the evidence standard, rather than the clear and

convincing evidence standard, applies to all exceptions to discharge of particular debts

contained in Bankruptcy Code § 523(a)).

C.    Applicable Law-Count I

Section 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge,

unless . . . the debtor knowingly and fraudulently, in or in connection with the case --,

. . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A).  In Lussier v. Sullivan (In re

Sullivan), 455 B.R. 829 (B.A.P. 1st Cir. 2011), the United States Bankruptcy Appellate

Panel for the First Circuit reaffirmed the well-settled standard adopted by the United

States Court of Appeals for the First Circuit in Boroff v. Tully (In re Tully), 818 F.2d 106

(1st Cir. 1987) for complaints under § 727(a)(4)(A):

> The First Circuit has dissected the language of § 727(a)(4)(A) into two parts:
> (1) the plaintiff must show that the debtor knowingly and fraudulently
> made a false oath; and (2) the false statement must relate to a material fact.
> See In re Tully, 818 F.2d at 110. Further, "the burden of proof rests with the
> [plaintiff] but once it reasonably appears that the oath is false, the burden
> falls upon the [debtor] to come forward with evidence that he has not
> committed the offense as charged." Id. (citing In re Shebel, 54 B.R. 199, 202

(Bankr. D. Vt. 1985) and quoting In re Mascolo, 505 F.2d 274, 276 (1st Cir. 1974)) (internal quotation marks omitted).

In re Sullivan, 455 B.R. at 837. The inquiry can be restated as whether (1) the debtor made a statement under oath, (2) the statement was false, (3) the Debtor knew the statement was false, (4) the Debtor made the statement with fraudulent intent, and (5) the statement was material to the bankruptcy case. Commonwealth of Massachusetts v. Bartel (In re Bartel), 05-13134-JBR, 2009 WL 2461727 at *5 (Bankr. D. Mass. Aug. 10, 2009); *see also* Irish Bank Resolution Corp. Ltd. (In Special Liquidation) v. Drumm (In re Drumm), 524 B.R. 329, 394 (Bankr. D. Mass. 2015), *aff'd*, No. 15-CV-10184-LTS, 2015 WL 9911447 (D. Mass. Nov. 20, 2015).

D.    Analysis-Count I

There can be no dispute that when Maurice filed his Original and Amended Schedules and SOFA, he did so under oath. *See* Fed. R. Bankr. P. 1008; Premier Capital, LLC v. Crawford (In re Crawford), 841 F.3d 1, 8 (1st Cir. 2016). He made further statements under oath at the § 341 Meeting. *See* United States Trustee v. Zhang (In re Zhang), 463 B.R. 66, 86 (Bankr. S.D. Ohio 2012) (any false statement made by the debtor in the debtor's schedules, at a creditors' meeting held pursuant to § 341, or during a deposition relating to the debtor's assets and financial circumstances could potentially lead to denial of a debtor's discharge under § 727(a)(4)(A) if all of the required elements to establish that exception are proven).

There also can be no dispute that Maurice made numerous false statements in his Original and Amended Schedules and SOFA and at the § 341 Meeting through

affirmative misrepresentations and/or omissions. *See* <u>In re Crawford</u>, 841 F.3d at 8 ("By omitting an account from his Schedule B, [the debtor] made a false oath."); *see also* <u>Olympic Coast Inv., Inc. v. Wright (In re Wright)</u> 364 B.R. 51, 73 (Bankr. D. Mont. 2007) *aff'd*, CV 07-053, 2008 WL 160828 (D. Mont. Jan. 16, 2008) ("A false oath may involve a false statement or omission in the debtor's schedules.") (quoting <u>Fogal Legware of Switzerland, Inc. v. Wills (In re Wills)</u>, 243 B.R. 58, 62 (B.A.P. 9th Cir. 1999)). Some false statements and omissions may have been the product of Maurice's faulty memory and confusion about the complex structure of the business. Given the volume of misrepresentations and nondisclosures, however, the Court concludes that many others were not the product of confusion or neglect but reflected an intention to conceal the truth of his assets and financial affairs, as discussed further below.

"A false statement is knowingly and fraudulently made if the debtor 'knows the truth and nonetheless willfully and intentionally swears to what is false.'" <u>Gordon v. Mukerjee (In re Mukerjee)</u>, 98 B.R. 627, 629 (Bankr. D. N.H. 1989) (citing <u>Butler v. Ingle (In re Ingle)</u>, 70 B.R. 979, 984 (Bankr. E.D. N.C. 1987) and quoting <u>Pigott v. Cline (In re Cline)</u> 48 B.R. 581, 584 (Bankr. E.D. Tenn. 1985)). "The intent required by § 727(a)(4)(A) is satisfied by a showing of reckless disregard for the truth[,]" <u>Robin Singh Educ. Serv., Inc. v. McCarthy (In re McCarthy)</u>, 488 B.R. 814, 826 (B.A.P. 1st Cir. 2013) (citing <u>In re Tully</u>, 818 F.2d at 112), which may be inferred from circumstantial evidence, such as the cumulative effect of a series of seemingly innocent mistakes. <u>In re Bartel</u>, 2009 WL 2461727, at *6 (citing <u>Distrib. Corp. of N.E. v. Zicaro (In re Zicaro)</u>, 07–43732–JBR, 2009 WL 1795302 at *2 (Bankr. D. Mass. June 22, 2009)); *see also* <u>In re McCarthy</u>, 488 B.R. at 826.

The Court must consider not only the omissions in the debtor's schedules but also his financial sophistication. In re Bartel, 2009 WL 2461727, at *6.

Based upon the documentary and testimonial evidence produced at trial and inferences permitted by circumstantial evidence, the Court finds that Maurice made numerous statements under oath which he knew to be false and he did so intentionally or, at the very least, with reckless disregard for the truth.

The Wymans were sophisticated businessmen who, at one point, owned and operated more than 20 restaurants and managed several real properties, which generated over $20 million per year in gross revenues.   They also had experience in bankruptcy cases, having emerged from a complex Chapter 11 case involving their business in 2007. In May 2009, as a result of the Burger King Litigation, Maurice and Michael transferred their Benanna equity to Cheryl and Renee who paid no consideration for it.  Shortly thereafter, in January 2010, Maurice and Michael were sued by Premier.  At that time, they each also had significant tax liabilities, their properties were subject to numerous tax liens, and Maurice, in particular, was a defendant in numerous lawsuits and had no personal bank account due to the "seizure" of his prior account by the Commonwealth of Massachusetts.   To conceal and shelter income from their creditors, Maurice and Michael constructed an elaborate scheme whereby Renee and Cheryl, as nominal owners of Benanna with little or no say in its management or operations, would receive distributions and remit most, if not all, of the funds to Maurice and Michael under the guise of "gifts" and "family support contributions."  Renee and Cheryl provided willing, if reluctant, assistance with this plan.  To perpetuate and conceal this fiction following

their bankruptcy filings, Maurice and Michael provided false, incomplete and misleading statements under oath in their Schedules and SOFAs and at the § 341 Meeting.

Notwithstanding Maurice and Michael's description of their Benanna titles at the § 341 Meeting as "bookkeepers" and "property managers," and their trial testimony that they were "answerable to" and "worked for" Renee and Cheryl, the Wymans, in truth, controlled all operations and business matters for the company. Renee and Cheryl, who both had employment outside of Benanna, testified that Maurice and Michael ran the day-to-day operations of Benanna, and Cheryl added that Michael and Maurice decided what bills to pay, which purchases to make, whether to transfer company funds, and that they did not confer with her about anything related to Benanna. While Renee maintained that she did do some things for the company, the Court credits Cheryl's testimony when she agreed that Maurice and Michael operated Benanna "the way they saw fit without regard to direction from [her] or Renee." The Court also credits the testimony of Mr. Synan who testified that Maurice and Michael were still the primary decision makers for the business after the LBK sale in 2009.  Moreover, Michael and Maurice had check signing authority for Benanna and wrote scores of checks to cash, thus controlling the company's finances.

As conceded by Maurice and Michael, Renee and Cheryl remitted most, if not all, of the after-tax Benanna distributions to them and allowed them to access and control those funds, in Renee's case, through the issuance of cash gifts to Maurice and through his permitted use of the Benanna checking account, and in Cheryl's case, through Michael's unmonitored use of the Benanna and Citizens accounts.  The conclusion thus

41

is inescapable that Maurice and Michael were the de facto owners and managers of Benanna.

As stated above, some of the false statements and omissions made by Maurice may have been the product of confusion or faulty memory, such as his failure to disclose 1) the Premier Judgment in his Original or Amended SOFA, 2) his managerial position with North Street Management, LLC in his Original SOFA, 3) his control over the Boston Wyman and M&M Trust bank accounts, and his incorrect disclosure in his Original Schedule B that he was an owner of the Boston N Entities and in his Amended Schedule B that he was a "50% shareholder" of North Street Management, LLC and Boston Wyman.   Likewise, he falsely testified at the § 341 Meeting that Benanna owned the Vehicles when they were owned by Boston N, Inc. and that North Street Management, LLC was "non-existent."

Maurice made more substantial misrepresentations and omissions in his Original Schedules and SOFA for the purpose of intentionally concealing the true nature of his assets and financial affairs described above.  First, in his Schedule I, he reported $942.50 in monthly gross wages and $1,000 in other monthly income he designated as "Contribution from Daughter."  The annual compensation from Benanna and gifts from Renee reported by Maurice on Schedule I for 2014 amounted to less than $24,000, a figure one-fifth of the amount Renee gifted to him in 2014 ($133,383) and significantly less than the amounts she gifted him in 2011 through 2013.  Maurice was well aware of the gift amounts he received for those years because he sent the Report to Mr. Synan two weeks before he filed his Schedule I.   Maurice did not explain in an adequate or even

comprehensible manner at trial how he arrived at the $1,000 "Contribution from Daughter" amount reported on Schedule I, and offered varied explanations of whether the amount was an estimate or cap of amounts he had or would receive from Renee in the future. The Court does not accept Maurice's explanation that these amounts were not "earnings" or "income" given his complete access and control of Benanna funds and his choice to disclose some, but not all, of the gifts on Line 8h of Schedule I. The Court also finds that Maurice's testimony at trial that the brothers were paid $250-$500 per week for their work, which he described as requiring "24/7" availability, was not credible. The Court finds Maurice's disclosure of income reported on Schedule I to be false, incomplete and misleading as it does not approximate the amount of Benanna distributions he received through Renee as his instrumentality. Additionally, Maurice testified at trial that he spent, on average, $2,000 per month on his son's medical bills but reported only $100 for medical expenses on his Schedule J because the medical bills he paid for his son were not "his." Given Maurice's significant underreporting of income on Schedule I, the Court finds ample support for the conclusion that he concurrently underreported his expenses on Schedule J. Moreover, Maurice also failed to report his true income in his Original or Amended SOFA (which also omitted the "Contribution from daughter").

Maurice made other intentional misrepresentations in his Original SOFA when he failed to disclose his possession and control of the Mitsubishi. The Court rejects Maurice's explanation that he failed to list the vehicle as an item he controlled "because I was probably paying for it at the time" as nonsensical. First, he was unable to coherently testify whether he or Benanna was making the car loan payments on the petition date.

Second, if he truly believed that he owned the car because he was making the loan payments, it is reasonable to conclude that he would have disclosed the vehicle on his Schedule B, which he did not. Likewise, the Court can assign no credibility to his muddled explanation at trial for his failure to list Mr. Synan and LMHS, P.C. as his accountant or the person/entity who had possession of his books of account, especially when he had previously disclosed Mr. Synan as his accountant/bookkeeper in his answer to Premier's post-judgment interrogatories in November 2014. The Court can only conclude that Maurice failed to list that information in his Original SOFA in hopes of maintaining the secrecy of his de facto ownership of Benanna. Additionally, Maurice made a false statement in his Original Schedule B when he failed to list his Personal Injury Claim. His tortured explanation of whether it was truly a "claim" requiring disclosure was unconvincing in light of his admission that the accident caused him bodily injury which might require surgery. Indeed the Trustee secured a settlement of the claim for more than $31,000. Lastly, Maurice made intentionally incomplete and misleading statements at the § 341 Meeting when he represented that he was Benanna's bookkeeper, rather than a de facto owner and co-manager of the company's day-to-day affairs.

Even in the absence of the numerous intentional false statements Maurice made under oath, the sheer volume of all of the misstatements and omissions in his Schedules and SOFAs establish "the type of extreme carelessness or reckless indifference that equates to fraud and a bar to discharge." Harrington v. Donahue (In re Donahue), 11-026, 2011 WL 6737074 at *13 (B.A.P. 1st Cir. Dec. 30, 2011) (quoting JRC Lumber Corp. v. Corona (In Re Corona), No. 08-15924 (DHS), 2010 WL 1382122, at *9 (D. N.J. Apr. 5, 2010)).

The Court rejects Maurice's excuse that the business history was "all a blur." There was ample documentation in the record from which the Wymans could have ascertained accurate information about their assets and affairs.  Moreover, the fact that Maurice amended some of his disclosures following questioning at the § 341 Meeting does not cure the false oath made in the original filings. "An inference of fraud is permissible when a debtor files an amendment only as a result of developments during or after the creditors meeting, or without adequate explanation of the initial inaccuracy." In re Zicaro, 2009 WL 1795302, at *3 (citing In re Tully, 818 F.2d at 110).

Lastly, the Court finds that false oaths made by Maurice were material to his bankruptcy case.  A false oath is material if its subject matter "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." Tully, 818 F.2d at 110-11 (quoting Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir. 1984)) (internal quotation marks omitted). "[T]he threshold to materiality is fairly low." In re Sullivan, 455 B.R. at 839 (quoting Cepelak v. Sears (In re Sears), 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000).  Maurice's deliberate omission of his use and control over half of the Benanna distributions, the Mitsubishi, and the Benanna bank account in his Original SOFA and Schedule I as well as the existence of the Personal Injury Claim in his Original Schedule B involved hundreds of thousands of dollars, far from the "immaterial misunderstandings" theory he espouses.  See In re Tully, 818 F.2d at 112 n.4 ("[V]aluation is not really the point"); see also In re Chalik, 748 F.2d at 618 ("The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly

omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious."). Maurice's omissions more than satisfy the low materiality threshold and warrant denial of his discharge.

As observed by the First Circuit in <u>Tully</u>, the statute, by its very nature, invokes competing considerations. "[T]he statutory right to a discharge should ordinarily be construed liberally in favor of the debtor[,]" but the purpose of § 727(a)(4)(A) is "to make certain that those who seek the shelter of the [B]ankruptcy [C]ode do not play fast and loose with their assets or with the reality of their affairs." <u>In re Tully</u>, 818 F.2d at 110 (internal citations and quotations omitted). The statute is "designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction." <u>Id</u>. Maurice's disclosures in his Schedules, SOFAs and at the § 341 Meeting warrant the conclusion that he "played fast and loose" with the reality of his financial affairs, justifying a denial of his discharge. To the extent he seeks to blame his counsel and other professionals for his erroneous and deficient disclosures, that defense fails. *See* <u>In re Tully</u>, 818 F.2d at 111 ("[I]t is well settled that reliance upon advice of counsel is, in this context, no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules."). Moreover, the record amply supports the conclusion that Maurice failed to adequately review documents prepared for him prior to commencement of the bankruptcy case.

For the above stated reasons, the Court finds that Premier has established by a preponderance of the evidence that Maurice knowingly and fraudulently made false

oaths in his Schedules, SOFAs and at the § 341 Meeting. Maurice failed to come forward with credible and convincing evidence that he did not do so, warranting a denial of his discharge under § 727(a)(4)(A). Judgment shall enter in favor of Premier on Count I of the Amended Complaint.

E.    Count II

Pursuant to § 727(a)(2)(A), a debtor is entitled to discharge unless, "the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the filing of the petition . . . ."   11 U.S.C. § 727(a)(2)(A). Given the facts of this case and the number of material false statements and omissions made by Maurice regarding his assets and financial affairs, the Court could easily conclude that he also concealed his property within a year of the bankruptcy filing with the intent to hinder, delay or defraud creditors under § 727(a)(2)(A) as set forth in Count II of the Amended Complaint, but it need not reach the merits of that claim in light of the ruling on Count I. *See* Friedman v. Sofro (In re Sofro), 110 B.R. 989, 991 (Bankr. S.D. Fla. 1990) ("The intent to hinder, delay, or defraud a creditor [under § 727(a)(2)(A)] may be imputed to a debtor where the debtor fails to make a full disclosure of his liabilities in the petition for relief and omits assets of substantial value from the Schedules.").

## VI. CONCLUSION

The Court awards judgment in favor of Premier and against Maurice on Count I

of the Amended Complaint.  Count II is moot.  A separate judgment shall enter.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: July 20, 2017